Jeff Lewis (CA Bar No. 66587)
Jacob Richards (CA Bar No. 273476)
KELLER ROHRBACK L.L.P.
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
Phone: (510) 463-3900, Fax: (510) 463-3901
jlewis@kellerrohrback.com
jrichards@kellerrohrback.com

T. David Copley
1201 Third Avenue, Suite 3200
KELLER ROHRBACK L.L.P.
Seattle, WA 98101-3052
(206) 623-1900, Fax (206) 623-3384
dcopley@kellerrohrback.com
tlin@kellerrohrback.com

Mark D. Samson
Christopher Graver
KELLER ROHRBACK L.L.P.
3101 North Central Ave., Suite 1400
Phoenix, AZ 85012
Phone: (602) 248-0088, Fax (602) 248-2822
msamson@kellerrohrback.com
cgraver@kellerrohrback.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| L.M., individually and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>v.<br><br>THERANOS, INC., a California Corporation, and WALGREENS BOOTS ALLIANCE, INC., a Delaware Corporation,<br><br>              Defendants. | No. 5:16-cv-3571<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Judge: |

## I.     INTRODUCTION

1.     Blood tests are a critical component of a patient's healthcare. Patients, as well as their doctors, rely on blood tests to detect conditions and use those results to help determine which course of treatment is or isn't needed. Inaccurate blood test results can contribute to serious conditions going undetected, to treatable conditions growing worse unnoticed, to patients forgoing medications they should take or taking medications they shouldn't. Inaccurate tests can cost patients time and money, change their life, cause emotional distress, lead to unnecessary and improper medical care, and endanger their health and life.

2.     Traditionally, blood collection and analysis is straightforward and reliably accurate. Standard blood draw techniques involve venipuncture (drawing blood from a vein, typically in the arm), the collection of a sample using vials of 5 to 10 milliliters, labeling and recording the sample, analyzing it in a lab, and then reporting the results to doctors trained to interpret them. Federal agencies regulate laboratories and lab devices so that patients and doctors can count on accurate testing.

3.     Founded in 2003 by Elizabeth Holmes, Defendant Theranos, Inc. ("Theranos") is a Silicon Valley startup that claims to be a "consumer health technology company" and introduced what it said was a revolutionary new way of drawing and testing blood. Instead of the large needles, tubes, and vials that phlebotomists conventionally use, Theranos claimed to have invented a system that drew blood with a mere pinprick to the fingertip, captured only a few drops in a tiny, proprietary vial or Capillary Tube Nanotainer ("Nanotainer"), and analyzed the sample on a secret device it code-named "Edison." Edison was supposed to be able to run dozens of tests using a single miniscule sample, generate results within minutes instead of days or weeks, and deliver results right to a patient's smartphone using a Theranos-developed app.

4.     In Fall 2013, Theranos announced a long-term partnership with Defendant Walgreens Boots Alliance, Inc. ("Walgreens"), operator of a nationwide drugstore chain. Walgreens and Theranos opened "wellness centers" that conducted blood testing inside Walgreens pharmacies using Theranos's

"tiny blood test." Both Theranos and Walgreens assured customers that these tests were highly accurate, industry leading in quality, and developed and validated under—and compliant with—federal guidelines.

5.      Theranos and Walgreens launched their first wellness centers in the Phoenix, Arizona area, along with two wellness centers in northern California near Theranos's Palo Alto headquarters. These wellness centers collected samples that were sent to Theranos-run labs in Scottsdale, Arizona, and Newark, California. Within months of announcing their partnership, Theranos and Walgreens were delivering blood tests to the public through more than 40 wellness centers. Bolstered by the enhanced retail presence and credibility provided through its partnership with Walgreens, Theranos had performed roughly 1.8 million lab tests by the end of 2015.

6.      However, despite the hype, Theranos's Edison system did not work, and the tests were inaccurate.

7.      The Wall Street Journal reported in October 2015 that by the end of 2014, Theranos was actually performing just a handful of tests using the proprietary system on which it had built its brand— less than 10% (or about 15 tests), according to a former senior employee. Theranos stopped using Edison altogether by June 2015. In place of its highly touted revolutionary proprietary testing system, Theranos secretly used conventional lab machines it purchased from third parties and even outsourced tests to university-affiliated, third-party labs. Even in the face of the public questioning regarding the Edison system, Theranos and Walgreens continued to promote Theranos and its blood tests as less-invasive, quick, and accurate.

8.      But the undisclosed use of conventional systems and outsourcing of tests in place of the Edison system was just the tip of the iceberg. On September 16, 2015, the Food and Drug Administration ("FDA") issued a two reports raising concerns, *inter alia*, with Theranos's design validation and that Theranos's Nanotainer was an uncleared medical device. In January 2016, the Centers for Medicaid and Medicare Services ("CMS") released a 121-page report detailing violations of federal regulations in Theranos's Newark lab, the most serious of which posed an "immediate" risk of serious injury or death to

patients.  The report included findings of five major violations pertaining to hematology, analytics, and staffing. The violations ranged from Theranos staffing its lab with unqualified and inadequately trained personnel to keeping freezers at incorrect temperatures to the failure to calibrate machines properly or sometimes at all. Theranos even failed its own internal quality-control checks but would then simply change its quality-control standards so that they matched the data. Independent experts in laboratory science conducted tests that have also confirmed consistent flaws in Theranos's results.

9.     Ms. Holmes told a Fortune reporter that her company was "about being able to do good," and that she was "building an early-detection system" so that "everybody [could] have access to the kind of testing infrastructure that can tell you about these conditions in time for you to do something about it." To the contrary, Theranos's and Walgreens' false and misleading marketing around the Theranos tests and  the accuracy of their test results prevented consumers from doing the right thing for themselves. As a result, tens of thousands of patients may have been given incorrect blood-test results which, in turn, could result in serious health consequences due to: incorrect diagnoses; the initiation of unnecessary or inappropriate treatments; a delay in or failure to seek treatment for a treatable health condition; the implementation of an ineffective or inappropriate plan of treatment; and/or exposure to unnecessary, inappropriate or potentially harmful treatments.

10.    Plaintiff, L.M., paid for a Theranos test at her local Walgreens store, relying on Walgreens' reputation for a longstanding provider of safe and reliable pharmacy care. She received inaccurate test results. Plaintiff, for herself, and all others similarly situated, brings this action for damages and injunctive relief.

## II.      JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because Plaintiff and Defendant are citizens of different states and because, upon information and belief, the aggregate amount in controversy exceeds $5,000,000 exclusive of costs and interest, there

are more than 100 members in the proposed Class, and at least one member of the Class of Plaintiffs is a citizen of a state different from a Defendant.

12.     This Court has personal jurisdiction over Defendant Theranos, Inc., because it is headquartered in Palo Alto, California, operates a laboratory in Newark, California, and conducts business in the state of California.

13.     This Court has personal jurisdiction over Defendant Walgreens Boots Alliance, Inc. because it conducts business in the state of California.

14.     Venue as to Defendant is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is also proper because Theranos resides in the District, transacted business within the District, and a substantial part of the events establishing the claims arose in this District.

### III.     PARTIES

15.     Plaintiff L.M. is a resident of Maricopa County, Arizona and is using her initials to protect her privacy in this litigation.  L.M. purchased and paid for a Theranos test at the Theranos Wellness Center located in Walgreen's pharmacy in Chandler, Arizona on October 5, 2015.

16.     Defendant Theranos is a Delaware corporation with its principal place of business in Palo Alto, California. Theranos operates two laboratories, one in Newark, California and another in Scottsdale, Arizona. In addition, Theranos operated Theranos Wellness Centers inside Walgreens stores in California and Arizona.

17.     Defendant Walgreens Boots Alliance, Inc., ("Walgreens") is a Delaware corporation with its principal place of business in Deerfield, Illinois. It is a global pharmacy-led health and well-being enterprise, which, among other segments operates the Walgreens retail pharmacy chain in the United States. Walgreens (along with Theranos) operated Theranos Wellness Centers inside its stores in Arizona and California, including one in the Walgreens store in Palo Alto, California.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Getting Started

18.   Driven by a desire to "revolutionize how effective health care is delivered," Elizabeth Holmes dropped out of Stanford University in 2003 at the age of nineteen to launch Theranos, despite the fact that she had only rudimentary engineering training and no medical training.

19.   The goal of Theranos was to revolutionize blood testing with tests that could be run with just a few drops of finger-pricked blood—the idea for her company springing forth from her self-professed fear of needles.  The company had five objectives: extract blood without syringes, make a diagnosis from a few drops of blood, automate the tests to minimize human error, do the test and get the results more quickly, and do this more economically.

20.   By 2004, Theranos had raised $6.9 million in funding and gained a valuation of $30 million.

21.   For the next decade, Holmes built the company and sought partners for her concept of the Theranos Wellness Centers. As Theranos described the vision for their Wellness Centers: "Anyone can walk into these Wellness Centers at convenient hours and get accurate, rapid lab testing with transparent prices that are always at least 50-80% below Medicare reimbursement rates."

22.   One of the early partners Theranos found was Walgreens. Walgreens made a deal with Theranos to put its blood-testing centers in thousands of its drugstores nationwide, starting with Arizona and California.

23.   Theranos exploded onto the diagnostic lab testing scene in 2013 with the Theranos Wellness Centers located inside Walgreens stores.  Walgreens not only hosted the Theranos Wellness Centers but also provided Theranos with $50 million in financing and assisted Theranos with scheduling patients and collecting payments.

24.     Theranos eventually opened 56 Theranos Wellness Centers in California and Arizona, the vast majority of which were located in Walgreens stores, even though they were staffed by Theranos employees.

**B.      Theranos's Tiny Blood Test and Big Claims**

25.     The main product Theranos offered to consumers was "[t]he tiny blood test."



26.     Theranos emphasized this with its tagline: "one tiny drop changes everything."



27.     The three pillars of the Theranos blood tests were the small sample needed ("as small as a single drop"), a quick turnaround, and accurate results. Theranos promoted this theme in its advertising materials, on its website, and in numerous public statements.

28.     Theranos boasted that it could analyze samples small as 1/100th to 1/1,000th the size of the ordinary blood draw. Theranos claimed: "We can perform hundreds of tests, from standard to sophisticated, from a pinprick and tiny sample of blood, and we have performed more than 70 tests from a single tiny sample."



29.     Theranos emphasized how it not only used smaller samples but also smaller needles for a less invasive blood-draw experience. They encouraged consumers to "[s]ay goodbye, big bad needle."





## goodbye, big bad needle.

Instead of a huge needle, Theranos-trained technicians can use a tiny finger stick[2] or collect a micro-sample from a venous draw.[2] It's practically painless and a lot less scary. Now the entire lab testing process is comfortable, accommodating, and less intimidating—for people big and small.

30.     Theranos assured consumers: "Not a big fan of needles? Neither were we.  So we got rid of them."



31.     Even though the Theranos tests used very little blood, Theranos claimed their tests were "fast, easy, and the highest level of quality."

32.     Theranos also emphasized a benefit if its test being the receipt of accurate results in a timely manner, stating that "what you decide about your health should be informed and timely enough to protect or improve it."



33.     Theranos boasted on its website, "We deliver your results fast and right to your phone – often within a matter of hours."

34.     Theranos's claims went beyond just being accurate to representing that its test results had "the highest levels of accuracy."

35.     Theranos assured consumers that "[w]e realize our mission only when our tests are performed to the highest standards of quality" and that "[w]e continuously conduct proficiency testing and participate in multiple proficiency testing programs."

36.     At the Wellness Centers, Theranos offered a comprehensive slate of some 200 lab tests. Theranos declared: "Every test that we offer in our lab can be run on our proprietary devices."

**C.    Walgreens Blindly Jumps**

37.     Theranos's partnership with Walgreens, a national drug store chain with thousands of stores, greatly bolstered the validity of Theranos.

38.     On September 9, 2013, Walgreens issued a joint press release with Theranos, affirming the promises made by Theranos, in which they pronounced that:

> Theranos, Inc. and Walgreens…today announced a long-term partnership to bring access to Theranos's new lab testing service through Walgreens pharmacies nationwide. As the service becomes available through Theranos Wellness Centers inside Walgreens stores, consumers will be able to access less invasive and more affordable clinician-directed lab testing, from a blood sample as small as a few drops, or 1/1,000 the size of a typical blood draw. The samples are either taken from a tiny finger stick or a micro-sample taken from traditional methods, eliminating the need for larger needles and numerous vials of blood required for most diagnostic lab testing … Theranos's proprietary laboratory infrastructure minimizes human error through extensive automation to produce high quality results. Test results are available to physicians in a matter of hours, enabling fast diagnoses to help informed treatment choices…

> "Theranos' service offers affordable certified lab testing with quicker response times, and furthers our mission to provide a differentiated patient experience," said Kermit Crawford, Walgreens president of pharmacy, health and wellness. "This is the next step in Walgreens' efforts to transform community pharmacy, giving our patients and customers convenient access to the comprehensive care they need, right in their communities."

39.     What Walgreens failed to disclose was that it in its desire to expand by "transform[ing] community pharmacy" through a venture into the blood-testing business with Theranos's technology, it had not fully validated Theranos's technology. Indeed, Walgreens entered into its partnership with Theranos and began promoting the Theranos blood tests and all their big claims without ever even seeing the magical testing device.

40.     The Wall Street Journal reported that before announcing the deal with Theranos in September 2013, some of Walgreens executives and outside advisers had their doubts about Theranos. Many of the concerns centered on the ability to vet the new technology from a startup company with a scant record. And Theranos's fierce secretive streak.

41.     In the spring of 2011, Johns Hopkins University scientists wanted to put Theranos's device in their laboratory to verify the technology on Walgreen's behalf as Walgreens was exploring a potential partnership with Theranos. Holmes brought with her to a meeting with Hopkins scientists a machine she

claimed could test tiny samples of blood for dozens of conditions, and she as well as Theranos President Sunny Balwani agreed to provide the Hopkins researchers with the device.  However, they never did so.

42.     In the summer of 2011, Walgreens sent representatives to Theranos headquarters with lab experts to review Theranos's business operations and lab capabilities. According to the Wall Street Journal, the Walgreens team was ushered into a conference room and "chaperoned throughout the visit," even when the Walgreens team used the restroom.  Access was not given to the lab area at Theranos or the Edison devices.

43.     Rather, Theranos provided a prototype.  However, the prototype "came with kits to perform esoteric tests that other labs and test makers apparently didn't offer" so that Walgreens could not compare the results from the Theranos prototype to any commercially available tests.

44.     Then, in October 2012, Paul Rust, a retired executive from Quest Diagnostics Corporation, a clinical-lab company, and two Walgreens executives went on a trip to review quality-control data at Theranos, According to Rust, neither he nor the other Walgreens executives were allowed to go into the lab housing the Edison devices. As a result, he had no idea if the results they were given were run on the Edison devices or not.

45.     As Walgreens neared a final agreement with Theranos, Theranos asked for more control, and Walgreens agreed to highly limit its access to data from the blood testing sites that would be housed in its stores.

46.     Despite all the red flags, Walgreens moved forward with its partnership with Theranos, provided Theranos with $50 million in financing and opening numerous Theranos Wellness Centers inside of Walgreens stores.

**It's easy to get started**

   

**1.**
Get a lab order from your clinician.

**2.**
Visit your nearest Theranos™ Wellness Center inside Walgreens.

**3.**
Bring your lab order to the pharmacy.

**4.**
Our friendly technician will take your sample.

47.     Walgreens did not close any of the Theranos Wellness Centers located inside its stores until January 2016, and then it only closed a single center in is Palo Alto, California store.

48.     Walgreens did not terminate its relationship with Theranos until June 12, 2016.

**D.     Things Fall Apart**

49.     While Holmes had dreams of how she could "revolutionize how effective health care is delivered" with Theranos's "revolutionary lab services," Theranos's claims regarding its tests and services were false, deceptive, and misleading.

50.     A recurring theme in public articles about the company was how "Holmes has kept her company, Theranos--which seeks to radically disrupt the lab test industry--shrouded in secrecy."

51.     As early as 2012, Theranos knew that concerns were being raised about how "the secretive company was violating federal law." According to the Washington Post, an official evaluating the Theranos test for use by the Department of Defense in a battlefield environment launched a formal inquiry with the FDA about Theranos's intent to distribute its tests without FDA clearance. Holmes apparently appealed to a four star marine general she had met at a Marine Memorial event to intervene on Theranos's behalf. Two months after the general retired from the Marine Corps, he asked a defense department ethics official about future employment with Theranos's board of directors.

52.     In February 2015, John Ioannidis, a Stanford researcher, raised concerns in the Journal of the American Medical Association with Theranos's secretive approach:

> Stealth research creates total ambiguity about what evidence can be trusted in a mix of possibly brilliant ideas, aggressive corporate announcements, and mass media hype. The unquestionable success of computer science, engineering, and social media technologies has created reasonable hope that these technologies can also improve health in ways that the biomedical and life sciences have failed to do until now. But then how can the validity of the claims made be assessed, if the evidence is not within reach of other scientists to evaluate and scrutinize?

53.     Mr. Ioannidis went on to observe, "investors, physicians, patients, and healthy people will not be able to judge whether some proposed innovation is worth $9 billion, $900 billion, or just $9 — let alone if the innovation will improve the health and well-being of individuals."

54.     In early May 2015, Eleftherios Diamandis, a Toronto pathologist and lab medicine researcher, published an opinion paper in the Clinical Chemistry and Laboratory Medicine Journal concluding that Theranos's "claims of superiority over current systems and practices are speculative, at best." In particular, he questioned the quality and robustness of Theranos's technology:

> The quality of the results are [sic] not known since the Theranos system has not been independently evaluated, nor do any published results exist to compare with conventional technologies. New diagnostic tests must be evaluated for their accuracy, precision, specificity and long-term robustness. Trueness and precision (accuracy) must be maintained over months or years, and monitored by external quality assurance programs, so that patient's data can be directly compared over long periods of time. Without independent validation, Theranos technology's quality and robustness will remain in question.

55.     On September 16, 2015, the FDA issued two Inspectional Observations reports to Theranos noting deficiencies with Theranos's devices and procedures. Among the deficiencies noted were:

- Theranos's Nanotainer was an uncleared medical device that was being shipped in interstate commerce;

- Quality audits have not been performed;

- Design validation did not ensure the device conforms to defined user need and intended uses;

- The design was not validated under actual or simulated use conditions; and

- Design input requirements were not adequately documents;

56.     At the same time the FDA reports were being issued, the Wall Street Journal ran two front-page articles exposing issues with Theranos.  Theranos struck back, posting a lengthy response on its website in which it continued to insist:

> "We provide blood tests faster, requiring far less blood and patient discomfort, than for any test previously available—or available today from any other laboratory…We are confident in the reliability of our tests, because we comprehensively validate the accuracy of every test we run … The faster speed and lower cost of our tests mean that consumers, and their doctors, can monitor their health so that problems are identified early enough to be addressed by medical professionals."

57.     In addition, Theranos highlighted in bold lettering its claim that **"[o]ur proprietary devices are making it possible to run finger-stick samples for tests that could never be run on finger-stick before."**

58.     Complaints also surfaced regarding the length of time it took to receive the results of Theranos tests.  For example, William Quirk, a research analyst at Piper Jaffray & Co., compared blood tests at he took through Theranos and two hospitals. While Theranos proclaimed in its marketing materials that it could provide results in hours, Quirk's Theranos results came back in 70 hours, nearly three times as long as the hospital labs.

59.     On January 25, 2016, Centers for Medicare & Medicaid Services ("CMS") wrote Theranos that it had determined through a Clinical Laboratory Improvement Amendments ("CLIA")[1] recertification and complaint survey that Theranos's facility was "not in compliance with all of the Conditions required for certification in the CLIA program." CMS further concluded that "it was determined that the deficient practices of the laboratory pose immediate jeopardy to patient health and safety."

60.     Theranos's response to CMS was unsatisfactory. Indeed, after reviewing Theranos's response, CMS informed Theranos in a March 18, 2016 letter that it had concluded that Theranos's

---

[1] CLIA is a federal regulatory standards program whose goal is to ensure accuracy, reliability and timeliness of test results, regardless of where the test was performed, for all clinical laboratory tests on humans.

response constituted neither a "credible allegation of compliance" nor "acceptable evidence of correction for the deficiencies cited":

> After careful review, we have determined that [Theranos's] submission does not constitute a credible allegation of compliance and acceptable evidence of correction for the deficiencies cited during the CLIA recertification and complaint survey completed on December 23, 201[5], and does not demonstrate that the laboratory has come into Condition-level compliance and abated immediate jeopardy. In general, we find that the statements made in the allegation of compliance and evidence of correction 1) failed to adequately address the deficient practice cited; 2) are incomplete and failed to meet the criteria of acceptable evidence of correction; 3) do not ensure sustained compliance; and 4) show a lack of understanding of the CLIA requirements.

61.     Based on this survey, Theranos was out of compliance with five CLIA Condition-level requirements:

| D5024: 42 C.F.R. § 493.1215 | Condition: Hematology |
|---|---|
| D5400: 42 C.F.R. § 493.1250 | Condition: Analytic systems |
| D6076: 42 C.F.R. § 493.1441 | Condition: Laboratories performing high complexity testing; laboratory director |
| D6108: 42 C.F.R. § 493.1447 | Condition: Laboratories performing high complexity testing; technical supervisor |
| D6168: 42 C.F.R. § 493.1487 | Condition: Laboratories performing high complexity testing; testing personnel |

62.     The report found that not only did Theranos's blood tests often fail to meet the lab's own standards but also that Theranos employed unqualified personnel to perform, review, and oversee patient test results. The report also found long delays in the notification of patients of flawed test result as well as the storage of blood samples at the wrong temperatures.

63.     The Wall Street Journal, which viewed an unredacted version of the 121 page report issued by CMS, revealed that CMS conducted 13 tests on the Edison devices, resulting in numerous problematic findings including:

- 29% of the quality control checks performed on the company's inventions in October 2014 fell outside the normal range;

- In February 2015, a hormone test run on Theranos's proprietary Edison machines failed 87% of quality-control checks;

- In April and May 2015, a test used to detect prostate cancer failed quality-control checks 22% of the time;

- Edison-run tests had frequent, erratic quality-control results in July 2014 as well as from February 2015 to June 2015 and that Theranos sometimes released results to patients even when the Edison devices used to run those tests produced erratic results in quality-control checks; and

- Edison machines often could not reproduce their own results on quality-control samples.

64. CMS inspectors also found that the Edison devices produced test results that differed widely from traditional lab machines for the same blood samples. For example, a gap between the Edison results and those from a traditional machine ranged from 21% to 130% when measuring Vitamin D. However, Theranos's written procedures directed that the difference should be "equal to or less than 20%" according to the Wall Street Journal article.

65. By the end of 2014, Edison actually handled just a small fraction of the Theranos tests sold to consumers, according to the same article.

66. Theranos admitted to regulators it used the Edison, its proprietary device, for 12 types of tests out of over 200 types offered to consumers and stopped using the devices altogether in late June 2015.

67. Rather than running its tests on its revolutionary and widely touted Edison device, Theranos tests were often (incorrectly) run on standard testing equipment.

68. By mid-May 2016, Theranos voided two years of test results—or tens of thousands of tests—from 2014 and 2015. Theranos also corrected some test results but did not revise others, leaving the void results as the only result the consumer received.

69. Theranos proclaims its mission is "to make actionable information accessible to everyone at the time it matters." Theranos claimed its "tiny blood test" was "fast, easy, and the highest level of quality." Theranos sold to consumers that their test results had "the highest levels of accuracy."

70.    Contrary to its mission statement and representations, Theranos's tiny blood test did not provide a test that only needed a finger prick, did not provide timely information, and did not provide accurate information to its consumers. In short, the Theranos test failed on all fronts.

71.    Theranos's promises were false, deceptive, and misleading.

72.    Walgreens's representations regarding the Theranos tests were similarly false, deceptive, and misleading.

73.    Consumers did not receive what they paid for when they receive blood tests from Theranos or when they purchased Theranos tests through Walgreens.

## V.    FACTUAL ALLEGATIONS CONCERNING PLAINTIFF

74.    On October 5, 2015, Plaintiff L.M. purchased a Theranos test at the Theranos Wellness Center in the Walgreen's pharmacy at 1919 North Dobson Road in Chandler, Arizona.

75.    L.M. had received orders from her physician to have a blood test. L.M. decided to go to Walgreens for a blood test because of Walgreens' reputation as a longstanding provider of safe and reliable pharmacy care. She purchased a Theranos because she was informed by her doctor it was the cheapest alternative for the test, and she relied on the representations on Theranos materials regarding the accuracy of the test results. L.M. paid $59.34 for the Theranos test.

76.    Despite the representations that the test could be done with a prick of the finger, one or more vials of blood were drawn from a vein in L.M.'s arm at the Theranos Wellness Center.

77.    Theranos tested the blood it drew from L.M.'s arm and reported results to her.  Having been led to believe the results were accurate, L.M. relied on them, using the results to make decisions concerning her health.

78.    Subsequently, L.M.'s doctor reported that she had heard that Theranos tests were not reliable and ordered a repeat of the test at a different laboratory facility.

79.    L.M. had blood drawn at a different laboratory on March 9. 2016, and the test originally performed by Theranos was repeated.   The results of the repeated test by a different laboratory

1    demonstrated that the results reported by Theranos were incorrect, and L.M. had been needlessly pursuing

2    a course of treatment for a condition she did not have.

3                              **VI.    CLASS ALLEGATIONS**

4        80.    Under Rule 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff seeks certification

5    of the following Class:

6        **National Class**: All purchasers of Theranos lab panels and blood testing services.

7        81.    In the alternative or as otherwise stated, Plaintiff seeks certification of the following Class:

8        **Arizona Class**: All purchasers of Theranos lab panels and blood testing services in Arizona.

9        82.    Excluded from the Classes are Defendant; the officers, directors or employees of

10   Defendant; any entity in which Defendant has a controlling interest; and any affiliate, legal representative,

11   heir or assign of Defendant. Also, excluded from the Class are any federal, state or local governmental

12   entities, any judicial officer presiding over this action and the members of his/her immediate family and

13   judicial staff, and any juror assigned to this action.

14       83.    Plaintiff does not know the exact number of Class members. But Theranos claims to have

15   conducted millions of tests, meaning there are at least tens of thousands of Class members such that joinder

16   of all Class members is impracticable.

17       84.    The Class is easily determined by objective criteria using Defendant's own records, which

18   by law must exist. Theranos knows where each test was performed, by whom, for whom, and when.

19       85.    There are questions of law and fact common to the Class. Defendant's illegal business

20   practices and unlawful omissions similarly impact Class members, all of whom purchased a Theranos

21   blood test. Plaintiff asserts claims that are typical of the Class. Plaintiff and all Class members have been

22   subjected to the same wrongful conduct because they all purchased a Theranos blood test marketed and

23   sold by Theranos using the same marketing or substantively similar marketing materials or received a test

24   conducted or handled in a similar way. And like other members of the Class, Plaintiff purchased and paid

for a Theranos blood test which he otherwise would not have paid for had the test been properly marketed based on truthful and accurate information or did not receive the test promised or due as a matter of law.

86.     As a purchaser of Theranos's services, Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff and the Class are represented by counsel competent and experienced in both consumer protection and Class action litigation.

87.     Class certification is appropriate because common questions of law and fact substantially predominate over questions that may affect only individual members of the Class, including:

     a.     Whether Theranos's blood tests were suitable or merchantable.

     b.     Whether Theranos's methodologies and equipment complied with industry, state, and federal standards.

     c.     Whether Theranos's blood tests were as represented or promised.

     d.     Whether Theranos's blood tests were of the highest accuracy and quality.

     e.     Whether Theranos misrepresented its tests were minimally invasive, accurate, and reliable.

     f.     Whether Theranos's conducted violation the UCL.

     g.     Whether the challenged practices harmed Plaintiff and members of the Class; and

     h.     Whether Plaintiff and members of the Class are entitled to damages, restitution, equitable relief, and/or injunctive relief.

88.     A Class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable. Because the restitution and/or damages suffered, and continue to be suffered, by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult, if not impossible, for individual Class members to redress the wrongs done to each individually and the burden imposed on the judicial system would be enormous.

89.     A Class action is manageable, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

# VII.   CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**(VIOLATION OF THE UNFAIR COMPETITION ACT,**
**CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, ET SEQ.)**
**Defendant Theranos**

90.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

91.    Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practice."

92.    Theranos's conduct, as alleged in the Complaint, constituted and constitutes unfair, unlawful and fraudulent business practices in violation of Section 17200, et seq. of the California Business and Professions Code.

93.    Defendant's conduct is unfair because it impairs competition within the market for blood tests. Theranos falsely advertises and claims its blood tests are minimally invasive, accurate, and reliable. Theranos's conduct prevents consumers from making fully informed decisions regarding where to have their blood tests performed and by whom. Reasonable consumers are likely to be deceived by Defendant's false statements.

94.    Defendant's conduct also offends established public policy supporting truth in advertising to consumers.

95.    Defendant has violated the fraudulent prong of section 17200 because it misrepresentation and material omissions are likely to deceive a reasonable consumer and the facts would be material to a reasonable consumer.

96.    Theranos's advertisements and public statements create the false impressions its blood tests are minimally invasive, reliable, and accurate when they are not.

97.     Consumers can choose their blood test provider. Given that Theranos's blood tests are equally invasive to traditional tests, unreliable, and inaccurate, the economic harm to consumers who had their tests performed by Theranos over its competitors is obvious.

98.     Theranos's misrepresentations and omissions were material, and likely to deceive reasonable consumers.

99.     Theranos knew or should have known that the marketing and sale of its blood tests as minimally invasive, reliable, and accurate was deceptive.

100.     Theranos had a duty to disclose the inherent flaws and limitations in its tests, and any inaccuracy and reliability problems before the tests were performed. Theranos also had a duty to disclose in a timely manner the fact that the tests were inaccurate and voidable. Theranos failed to fulfill these obligations.

101.     Plaintiff and Class members have suffered injury, including the loss of money, as result of Defendant's unlawful, unfair, and/or deceptive practices. Plaintiff and Class members are accordingly entitled to disgorgement of Theranos's profits, plus interest and attorneys' fees, under California Code of Civil Procedure § 1021.5.

## SECOND CAUSE OF ACTION
### (CONSUMER LEGAL REMEDIES ACT.)
### (CAL. CIV. CODE § 1750, ET SEQ.)
### Defendant Theranos

102.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

103.     Defendant is a "person" under Cal. Civ. Code § 1761(c).

104.     Plaintiff and Class members are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased blood tests from Theranos.

105.     The blood tests are "goods or services" under Cal. Civ. Code § 1770(a).

106.   Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have...."

107.   Cal. Civ. Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

108.   Theranos violated these CLRA provisions by it misrepresentations and omissions regarding the sponsorship, approval, certification, characteristics, benefits, standards, and quality of its blood testing in its advertising.

109.   As alleged in the Complaint, Theranos creates the impression that it is providing consumers with the most advanced, accurate, least invasive, and highest quality testing available in the market. Theranos omits and fails to disclose that (1) its labs were negligently maintained and operated, and did not follow proper procedures and policies; (2) consumers did not receive revolutionary, fast, minimally invasive techniques on cutting edge technology promised by Theranos; (3) Theranos did not strive to provide accurate information to its consumers so they could make an informed choice despite promises to do so; (4) its promises that its tests are of the highest levels of accuracy and quality are false, deceptive, and misleading; and (5) consumers are not getting what they paid for when they receive blood tests from Theranos.

110.   Theranos's omissions are material. Reasonable consumers would consider the promise of minimally invasive, accurate, and reliable blood tests—indeed, the most accurate and highest quality tests according to Defendant— to be important in determining whether or not to purchase blood tests from Theranos or another provider.

111.   Reasonable consumers were likely to be deceived, and were in fact misled, by Defendant's misrepresentations and omissions.

112.   Theranos knew or reasonably should have known that the marketing and sale of its blood tests was and is deceptive.

113.    Plaintiff and Class members were directly and proximately injured by Theranos's conduct and lost money as a result of, and in reliance on, Defendant's misrepresentations and omissions, because they would not have purchased or paid as much for the Theranos blood tests had they been told the truth.

114.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a general practice that is still being perpetuated and repeated.

115.    In accordance with Civil Code § 1780(a), Plaintiff and Class members seek injunctive and equitable relief for Defendant's violations of the CLRA, including an injunction to enjoin Theranos from continuing its deceptive advertising and sales practices.

116.    In accordance with Civil Code § 1782(a) of the CLRA, Civ. Code § 1782(a), on June 24, 2016, Plaintiff's counsel served Defendant with notice of their alleged violations of the CLRA by certified mail, return receipt requested. After 30 days of the date of such notification, Defendant intends to amend his Complaint to maintain an action for damages under Section 1780 of the CLRA, Civ. Code § 1780.

### THIRD CAUSE OF ACTION
### (CALIFORNIA CIVIL CODE § 1710 - DECEIT)
### Defendant Theranos

117.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

118.    Based on Defendant's conduct as discussed above, Defendants have engaged in fraud and deceit as set forth in California Civil Code § 1710. Plaintiff and the Class members have reasonably relied on the material misrepresentations and omissions made by Defendants and have been damaged thereby.

### FOURTH CAUSE OF ACTION
### (ARIZONA CONSUMER FRAUD)
### Defendant Theranos

119.    Plaintiff on behalf of herself and the Arizona Class incorporates by reference the allegations in the above paragraphs as if fully set forth.

120.     Defendant's advertising and website made use of deception, deceptive acts, unfair acts, fraud, false pretenses, false promises, misrepresentations, concealments, suppression of material facts, and/or omission of material facts in connection with the sale and advertisement of its services in violation of the Arizona Consumer Fraud Act, Arizona Revised Statute § 44-1522 (A). These acts include, but are not limited to:

•     Advertising its tests are the most accurate in the industry when they are the least accurate.

•     Advertising its proprietary Edison machine can test blood accurately and reliably using smaller quantities of blood than traditional methods even though each claim is false. By Defendant's own admission, all tests conducted using the Edison machine between 2014 and 2015 are invalid and should be voided.

•     Advertising that many of its tests are minimally invasive, requiring a skin prick or small vial of blood when in reality the tests require a traditional blood draw by the same size needle and vial used by its competitors.

•     Advertising its proprietary technology as if it exists and is used for all Theranos tests when it only exists for a small fraction of the tests Theranos markets and sells.

•     Advertising it performs the highest quality testing in the industry when its testing procedures and equipment are flawed and fail to meet its own standards, standards set by the manufacturer, and industry, state, or federal standards.

•     Advertises its goal is to give consumers actionable information but conceals and obfuscates on the methodologies of its tests.

•     Failing to notify consumers in a timely manner that its tests were inaccurate and voidable despite knowing that the tests were not reliable or accurate.

121.    Theranos intended that others rely on the concealment, suppression or omission of material facts by, among other things, promising to disclose the results of independent testing of its equipment and methodology but failing to do so.

122.    Theranos has engaged in a pattern or practice of misrepresentation and deceptive conduct in the sale of blood testing services to consumers.

123.    Theranos's actions were willful because it knew or should have known that the practices described in this Complaint violated the Consumer Fraud Act.

**FIFTH CAUSE OF ACTION**
**NEGLIGENCE**
**Defendants Theranos and Walgreens**

124.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth

125.    Theranos and Walgreens each had a duty to provide Plaintiff and the Class with reliable, accurate laboratory testing.

126.    Theranos and Walgreens breached this duty by providing laboratory tests that were unreliable, conducted in a manner that did not satisfy federal standards for quality control, in laboratories that did not meet federal standards for staffing, on inadequately maintained and calibrated equipment.

127.    Plaintiff and Class members were damaged as a direct and proximate result of these breaches, including by payment for lab testing services that were unreliable, by submitting to lab testing that they would not have if they had known the tests were unreliable and worthless, by suffering physical invasion of their persons under the false pretense that the blood withdrawal they underwent would result in accurate and reliable test results.

128.    Plaintiff and the Class are entitled to actual and punitive damages.

**SIXTH CAUSE OF ACTION**
**(NEGLIGENT MISREPRESENTATION)**
**Defendants Theranos and Walgreens**

129.    Plaintiffs incorporate the above allegations by reference.

130.    Theranos and Walgreens provided false information to Plaintiffs and the Class, for example, that the lab tests they sold were highly accurate and reliable, when in fact the blood tests were not.

131.    Theranos and Walgreens intended for Plaintiffs and the Class to rely on their representations of accuracy and reliability.

132.    Plaintiffs and the Class actually and justifiably relied on the representations made to them by Theranos, a corporation in the business of supplying purportedly advanced blood testing services, and Walgreens, a company of long standing and nationwide reach known for providing pharmacy care.

**SEVENTH CAUSE OF ACTION**
**(BREACH OF CONTRACT)**
**Defendant Theranos**

133.    Plaintiff incorporates the allegations in the above paragraphs as if fully set forth herein.

134.    Defendant entered contracts with Plaintiff and Class members that were identical or substantially identical. Each contract provided that in exchange for monetary consideration, Theranos would provide reliable blood tests with its proprietary "Edison" blood analysis technology.

135.    Plaintiff and other Class members each paid money directly or indirectly, for the blood tests offered by Theranos. Plaintiff paid $59.34 for the blood tests related to her medical condition.

136.    Theranos breached its contract with Plaintiff and Class members by  (1) providing tests that were not of the promised high level of accuracy and quality; (2) conducting tests using traditional blood testing methodologies and equipment instead of its self-proclaimed minimally invasive state-of-the art proprietary system; (3) failing to draw blood in the minimally invasive way advertised; (4) failing to ensure its equipment met its own quality standards; (5) failing to ensure its services were tendered with reasonable care and workmanlike effort, including failing to ensure its equipment met industry, state, or federal standards and failing to ensure lab staff was properly trained and monitored; and (7) failing to act in good faith and deal fairly with Class members by acting to deprive Class members of the justified expectations they were to receive under the contract, including failing to notify Class members in a timely

fashion of the deficiencies and problems with the tests or their results and not clarifying that certain services were conventional and no different than other blood tests on the market.

137.   In May 2016, Theranos informed federal health regulators that the company had voided all 2014 and 2015 blood test results from its Edison blood-testing devices. Each Class member who had a test using the Edison technology during those years did not receive the benefit of their bargain – a reliable, accurate blood test.

138.   Theranos purports to be issuing corrected results, but upon information and belief it is impossible re-test samples and give accurate and reliable updated results from samples taken in 2014 and 2015, especially when the blood draws should have been minimally invasive, small sample sizes according to Defendant's own advertisements.

139.   Even if re-testing the samples were feasible and would yield accurate, reliable results, these re-tests would still not adequately remedy Defendant's breach of contract. Such blood tests, by their nature, are administered to provide time-sensitive information about an individual's health condition. Receiving such information months or even years after the date of testing will in most cases be of little to no value to Class members.

140.   As a result of Defendant's conduct, Plaintiff and Class members have been injured.

**EIGHTH CAUSE OF ACTION**
**(UNJUST ENRICHMENT)**
**Defendant Theranos**

141.   Plaintiff incorporates the allegations in the above paragraphs as if fully set forth herein.

142.   In the event that there is no legal contract between Theranos and Class members, Plaintiff alleges the following in the alternative to the breach of contract claim alleged herein, on behalf of herself and the Class.

143.   As the intended and expected result of its conscious wrongdoing as set forth in this Complaint, Theranos has profited and benefited from the unlawful sale of its misleading, unreliable, and inaccurate blood tests.

144.   To the detriment of Plaintiff and Class members, Theranos has been and continues to be unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein.

145.   Theranos has voluntarily accepted and retained the fees paid by Plaintiff and Class members with full knowledge and awareness that as a result of its unlawful conduct, Plaintiff and the Class paid substantial monies to Theranos to which it was not lawfully entitled.

146.   Plaintiff and Class members paid for minimally invasive, accurate, and reliable blood tests, but received invasive, inaccurate and unreliable tests.

147.   Between Theranos and Plaintiff/Class members, it would be unjust for Theranos to retain the benefits attained by its wrongful actions.

148.   Theranos has been unjustly enriched at the expense of Plaintiff and Class members who are entitled in equity to disgorgement and restitution of Defendant's wrongful profits, revenue, and benefits, to the extent, and in the amount deemed appropriate by the court, and any other relief the court deems just and proper to remedy Defendant's unjust enrichment.

### NINTH CAUSE OF ACTION
### (AIDING AND ABETTING)
### Defendant Walgreens

149.   Plaintiff incorporates the allegations in the above paragraphs as if fully set forth herein.

150.   Theranos has committed torts causing injury to Plaintiff.

151.   Walgreens knew that Theranos breached its duties to Plaintiffs by providing laboratory tests that were unreliable, conducted in a manner that did not satisfy federal standards for quality Control, in laboratories that did not meet federal standards for staffing, on inadequately maintained and calibrated equipment.

152.   Walgreens substantially assisted and encouraged Theranos in the breach by agreeing with Theranos to open wellness centers within its stores by which Theranos could offer Plaintiffs and the Class unreliable and inaccurate lab tests.

153.    Walgreens' assistance and encouragement caused Theranos's breach by permitting Theranos to reach an expanded market of consumers and by giving Theranos, a relatively unknown company, the implicit approval of Walgreens, a longstanding company.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and for members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.    Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel and Plaintiff as Class representative;

B.    An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at trial;

D.    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

E.    An award of costs and attorneys' fees; and

F.    Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

DATED this 24th day of June, 2016.

KELLER ROHRBACK L.L.P.


By: /s/ Jeff Lewis
Jeff Lewis (CA Bar No. 66587)
Jacob Richards (CA Bar No. 273476)
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
Phone: (510) 463-3900, Fax: (510) 463-3901
jlewis@kellerrohrback.com
jrichards@kellerrohrback.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

T. David Copley
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900, Fax (206) 623-3384
dcopley@kellerrohrback.com

Mark D. Samson
Christopher Graver
3101 North Central Ave., Suite 1400
Phoenix, AZ 85012
Phone: (602) 248-0088, Fax (602) 248-2822
msamson@kellerrohrback.com
cgraver@kellerrohrback.com

*Attorneys for Plaintiffs*